800 P.2d 1240

**STATE of Arizona, Appellee,**

v.

**Ronald Turney WILLIAMS, Appellant.**

No. 6275.

Supreme Court of Arizona,
En Banc.

Oct. 8, 1987.

Supplemental Motion for Reconsideration
Denied Dec. 4, 1990.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Barbara A. Jarrett, Asst. Attys. Gen., Phoenix, for appellee.

Terrance L. Britt, Wheeling, W. Va., and Olliphant and Cook by S. Alan Cook, Phoenix, for appellant.

FELDMAN, Vice Chief Justice.

A jury convicted Ronald Turney Williams of first degree murder and first degree burglary. Williams was sentenced to death for the murder conviction and to an aggravated term of fourteen years for the burglary conviction. His appeal to this court is automatic pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 13–4031 (Supp.1986).

## I.  FACTS

John Bunchek, an elderly Scottsdale resident, was shot to death on March 12, 1981. Just prior to the shooting, a white male had knocked on the Buncheks' door and inquired whether their next-door neighbors, Mr. and Mrs. Tancos, were home.  Mrs. Bunchek told the suspect that she had seen Mrs. Tancos leave a few minutes earlier. Mrs. Bunchek's suspicions were aroused when she observed the suspect walking toward the Tancos residence.  When Mr. Bunchek returned home a few minutes later, Mrs. Bunchek asked him to walk next door and check on the situation.  Mrs. Bunchek went to the Tancos residence herself after her husband failed to return.  She found Mr. Bunchek lying face down on the family room floor.  He had been shot in the chest and later died from the wound.

Several small items were taken from the Tancos residence during the burglary.  The record does not indicate whether any of the items ultimately were recovered.  None of the items were found in Williams's possession, nor were any traced to him.

Four of the Buncheks' neighbors, Brenda Wood, William Koranda, and Alan and Elizabeth Tautkus, saw a suspect in their neighborhood on March 12.  Mrs. Bunchek, Wood, and Koranda all talked with the suspect face-to-face.  Alan and Elizabeth Tautkus saw the suspect for approximately five seconds as they were driving past him in their car.

Wood and Mr. and Mrs. Tautkus provided descriptions of the suspect to a police artist.  Their descriptions resulted in a composite drawing that was printed in local newspapers on March 13.  Lynn Walsh, Williams's roommate, saw the drawing in a newspaper and mentioned to James McClaskey and Cheryl Le Duc, Williams's other roommates, that the drawing looked like Williams.  McClaskey subsequently called Silent Witness and reported their suspicions.

Meanwhile, Williams had taken all of his belongings and left Scottsdale on March 12. He had not said anything to his roommates about leaving.  He was arrested in New York City on June 8, 1981, following a shoot-out with FBI agents.

Williams initially was represented by an attorney appointed by the Maricopa County Public Defender's Office.  During pretrial proceedings, however, Williams requested that he be allowed to represent himself. Williams based his request primarily on his inability to work with or agree on defense tactics with his attorney.  The trial court initially denied Williams's request, and the public defender's office substituted a more experienced attorney.  Once again, however, the attorney-client relationship allegedly broke down, and Williams made another motion requesting the court to recognize his constitutional right to act as his own counsel.  *See Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); 2 W. LaFAVE & J. ISRAEL, CRIMINAL  PROCEDURE  § 11.5, at 42–53 (1984).  After a hearing in which he explained the pitfalls of self-representation, the trial judge granted Williams's motion. As urged by the judge, Williams agreed to allow a public defender to continue as "advisory counsel."

The state's case against Williams was based primarily on circumstantial evidence. For example, Williams's gun fired the bullet that killed Bunchek; a footprint left on the Tancoses' door matched the tread marks of a type of athletic shoe owned by Williams when he lived in Scottsdale; and Williams left Arizona without telling anyone where he was going.  In addition, an FBI agent testified that in response to his query, "What about the old man in Scottsdale," Williams replied, "If [I] hadn't been framed [1] in the first place, it would never have happened."  Finally, Mrs. Tautkus's identification testimony placed Williams near the crime scene on March 12.

Williams testified in his own defense. He alleged that McClaskey and someone named Bobby had borrowed his gun and committed the crime.  He testified that he left Arizona because he was wanted in West Virginia and was afraid of being investigated in Arizona.  Williams called nu-

---

1.  Williams's allusion to being framed is apparently in reference to a prior murder conviction.

merous witnesses to attempt to cast doubt on the state's version of events. For example, Wood and Koranda both testified that Williams was not the man they had seen in Bunchek's neighborhood on March 12. Ultimately, however, the jury concluded that the state had proved its case beyond a reasonable doubt.

The trial judge ordered two psychological evaluations for inclusion in the presentence report and held a mitigation and aggravation hearing pursuant to A.R.S. § 13–703 (Supp.1986). The court found no mitigating circumstances and two aggravating circumstances: that Williams had two prior convictions for which life imprisonment could be imposed, and that Williams murdered Mr. Bunchek for pecuniary gain. A.R.S. § 13–703(F)(1), (5). The judge therefore sentenced Williams to death. *See* A.R.S. § 13–703(E).

## II. DISCUSSION

Williams raises a host of constitutional issues, ranging from alleged due process violations to the constitutionality of Arizona's death penalty statutes. We address each argument in turn.

### A. *Pretrial Identification*

#### 1. *The Issue*

At a pretrial deposition requested and personally conducted by Williams, Mrs. Tautkus identified Williams as the man she had seen in Bunchek's neighborhood on March 12. At trial, Mrs. Tautkus recounted her pretrial identification and again identified Williams as the suspect.

Although Williams requested the Tautkus deposition, he now argues that the trial court violated his due process rights by admitting Mrs. Tautkus's identification testimony. Mrs. Tautkus's identification should have been ruled inadmissible, Williams argues, because the circumstances surrounding her deposition created a "substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *see also Stovall v.*

*Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

We begin our consideration of Williams's argument by recounting the circumstances leading up to and surrounding the Tautkus deposition. We then turn our attention to the scope of the due process protection claimed by Williams.

#### 2. *Facts*

Police investigators asked Wood, Koranda, Mr. and Mrs. Tautkus, and Mrs. Bunchek to look at a six-person photospread within thirty days of Mr. Bunchek's death. None of the five correctly identified Williams's photo. Consequently, the state did not list Wood, Koranda, or either of the Tautkuses as trial witnesses.[2] Williams, however, contacted each of these persons in preparation for his defense.

Before trial began, the public defender's office interviewed Wood and deposed Koranda. Wood and Koranda were shown various pictures of Williams, but neither could identify him as the man they had talked with on March 12, 1981. At trial, Wood and Koranda were called as defense witnesses, testifying that Williams was not the man they had talked with the day of the murder.

Williams also contacted Mr. and Mrs. Tautkus before his trial. When they refused to cooperate, Williams requested the court to subpoena them for depositions. Williams also requested that he personally be allowed to depose the Tautkuses in civilian clothes. The court ordered the depositions but denied Williams's motion to appear in civilian clothes.

The depositions took place on August 28, 1983, approximately two years and five months after the Tautkuses had seen the suspect in their neighborhood. Aside from the initial photospread, the depositions were the Tautkuses' first opportunity to identify Williams; neither the state nor Williams had attempted a pretrial lineup or other identification procedure.

**2.** Mrs. Bunchek passed away and therefore was unavailable as a trial witness.

When Mr. and Mrs. Tautkus arrived at the courthouse for their depositions, Richard Mesh, Williams's advisory counsel, introduced himself and explained that he was responsible for the subpoenas requiring their presence. According to Mesh's trial testimony, Mr. and Mrs. Tautkus refused to shake his hand and Mrs. Tautkus stated that "she didn't want any part of this ... wasn't going to testify and ... wasn't going to help the defense in any way...." Trial Transcript (TT), Jan. 19, 1984, at 18–19. Mesh responded that he would obtain a court order compelling Mrs. Tautkus to testify if necessary. *Id.* at 19. Mrs. Tautkus responded that she was not going to do anything to help that "son of a bitch" [Williams]. *Id.* at 19, 26. A shouting match apparently ensued, with Mr. Tautkus stepping in to defend his wife. *Id.* at 19–20.

At this point, Mr. Turoff, the prosecuting attorney, intervened. He introduced himself to Mr. and Mrs. Tautkus and attempted to calm them, telling them that the witnesses were there to help "determine the accuracy of the information ... in the police report and [to see if] ... they could identify [Williams] as being the fellow ... they had seen in their neighborhood on the day that Mr. Bunchek had been shot." *Id.* at 21. Significantly, Turoff added that he did not know personally whether Williams had done the shooting and that he only wanted Mr. and Mrs. Tautkus "to truthfully testify what they knew, what they could say." He expressly admonished them not to make any prejudgments. *Id.*

Mrs. Tautkus was deposed first. Before Williams began questioning her, Mesh explained that Williams was the defendant in the case and that he was representing himself. In response to Williams's questioning, Mrs. Tautkus conceded that she had been unable to identify Williams from the photospread. She then testified as follows:

Williams: Let me ask you this, Mrs. Tautkus: Am I the person that you saw walking on Malcomb Drive on the morning of March the 12th, 1981?

Mrs. Tautkus: Will you take your glasses off?

Williams: Yes, Ma'am.

Mrs. Tautkus: You certainly resemble him.

Williams: All right. Can you think of any other questions?

Mrs. Tautkus: Could he [sic] stand up with your glasses off? Does resemble him.

Williams: Mrs. Tautkus, you realize that this is a most serious matter for everyone concerned; don't you?

Mrs. Tautkus: Definitely.

Williams: And you also realize that my life is in jeopardy in regards to this identification, your identification; do you understand that?

Mrs. Tautkus: Yes.

Williams: Would you be willing to say beyond a reasonable doubt with a moral certainty that I'm the person you saw walking on Malcomb Drive on that morning at about 11:00?

Mrs. Tautkus: Yes, without your glasses on.

\* \* \* \* \* \*

Williams: Well, you say that I look like him or similar or familiar to that person, but—

Mrs. Tautkus: It's been two and a half years.

Williams: I understand that. *The reason I called you, had you subpoenaed over here, Mrs. Tautkus, was to attempt to give you an opportunity to see me in person.*

\* \* \* \* \* \*

I would intend to call you and your husband as a witness [sic] during the course of this trial.

\* \* \* \* \* \*

Mrs. Tautkus, would you be willing to testify for me that I was not the person present on that date, March the 12th, on Malcomb Drive?

Mrs. Tautkus: No.

Deposition of Elizabeth Tautkus, August 12, 1983, at 41–44 (emphasis added).

Following this deposition testimony, the state decided to call Mrs. Tautkus as a trial witness. At trial, Mrs. Tautkus reviewed

her deposition and made an in-court identification of Williams. TT, Dec. 22, 1983, at 124. Mrs. Tautkus conceded that she had found Williams's appearance at the deposition in prison garb and manacles "a little disturbing." TT, Dec. 28, 1983, at 34–35. She stated, however, that Williams's clothing did not influence her identification. *Id.* at 51. Mrs. Tautkus was subjected to thorough cross-examination regarding the accuracy and reliability of her identification.

Williams also deposed Mr. Tautkus. Before coming into the hearing room for his deposition, Mr. Tautkus asked Mesh whether Williams was really the defendant accused of killing Mr. Bunchek. Mr. Tautkus apparently was concerned that the real defendant was "trying to pull a fast one" on him by "bring[ing] somebody else in to trick" him. Mesh assured him that no trick was intended and that Williams was really the defendant charged with killing Mr. Bunchek. TT, Jan. 19, 1984, at 23.

Mr. Tautkus's deposition testimony was slightly different from his wife's testimony. He was not as certain that Williams was the man he and his wife had seen in their neighborhood two years earlier. *Williams called* Mr. Tautkus as a defense witness at trial. Although Mr. Tautkus expressed some uncertainty, he testified in his deposition and again at trial that Williams "looked like" and "could be" the suspect.

Mr. Turoff: You're not telling us now almost three years later that is the man—are you telling us that is the man?

Mr. Tautkus: Yeah, I can almost say that. I can't be 100 percent sure, but I can be over 50.

Mr. Turoff: Over 50 percent sure?

Mr. Tautkus: Yeah. I would say about 80 percent sure, 80, 90.

TT, Jan. 23, 1984, at 66–67.

### 3. *Resolution*

■ To establish that the admission of Mrs. Tautkus's testimony violated his due process rights, Williams must establish (1) that the circumstances surrounding the pretrial identification "created a substantial likelihood of irreparable misidentification," *Simmons,* 390 U.S. at 384, 88 S.Ct. at 971, and (2) that the state bore sufficient responsibility for the suggestive pretrial identification to trigger due process protection. This second point is important because the due process clause does not preclude every identification that is arguably unreliable; it precludes identification testimony procured *by the state* through unduly suggestive pretrial procedures. *E.g., Wilson v. Commonwealth,* 695 S.W.2d 854, 857 (Ky.1985) ("Implicit in the first prong of the *Biggers* test is a finding that the government had some hand in arranging the confrontation.").

■ The facts clearly establish the first factor: Mrs. Tautkus identified Williams under extremely suggestive circumstances. Mrs. Tautkus had a limited opportunity (perhaps five seconds) to view the suspect on the day of the crime, and, because she was unaware of the crime, she had little reason to remember what he looked like. Soon after the crime, she failed to identify Williams from a photospread. Her subsequent identification occurred more than two years later. *See State v. Strickland,* 113 Ariz. 445, 448, 556 P.2d 320, 323 (1976) (holding under similar facts that ten-day time period between crime and identification cast doubt on identification's reliability). In these circumstances, the deposition was essentially a one-man "showup," a practice courts have widely condemned. *E.g., Stovall,* 388 U.S. at 302, 87 S.Ct. at 1972. Worse, Williams appeared in jail clothes and manacles and was identified by his advisory counsel and by the prosecutor as the defendant in the case. Furthermore, both Williams and the prosecutor told Mrs. Tautkus that the purpose of the deposition was to see if she could identify the man before her as the suspect she had seen in her neighborhood on the morning of Bunchek's death. *Cf. Strickland, supra.* The facts clearly establish the suggestibility of the identification procedure.

The second factor—the state's complicity in obtaining the identification—is a barrier Williams cannot surmount. This is not the usual case where the defendant is com-

plaining about a suggestive pretrial procedure *used by the state* to obtain an identification. *See, e.g., Strickland, supra; Stovall, supra.* Here, Williams, not the state, requested the deposition, told Mrs. Tautkus he was the defendant, and then asked her whether she could identify him.

Williams's role in procuring the identification under suggestive circumstances undermines his due process argument. Mrs. Tautkus's deposition was suggestive primarily because it necessitated a one-on-one confrontation between Williams and Mrs. Tautkus. The state did not compel Williams to depose Mrs. Tautkus or to seek testimony from Wood or Koranda. In fact, the state had not listed any of the eyewitnesses as potential trial witnesses. Williams's purpose in deposing the witnesses was to see if they could testify in his defense that he was not the man they had seen two years earlier. Williams's strategy worked to his advantage as well as to his disadvantage: Wood and Koranda testified as defense witnesses; Mr. Tautkus testified equivocally that Williams "looked like" the suspect; and Mrs. Tautkus identified Williams as the man she had seen leaving the scene of the crime.

We recognize that various circumstances arguably attributable to the state—the trial court's refusal to allow Williams to appear in civilian clothes and the prosecutor's comment to Mrs. Tautkus that the defense just wanted to see if she could identify Williams—contributed to the suggestive nature of the deposition. However, these factors are insignificant when compared to Williams's own decisions. The first was to proceed with depositions of uncooperative witnesses such as Mr. and Mrs. Tautkus, even though he already had the evidence he needed from Wood and Koranda. The second was Williams's refusal to allow counsel to take the deposition; by insisting on his right to confront the witnesses personally, Williams risked identifying himself as the suspect by his very presence, let alone by the content of the questions to the witnesses. In this light, Williams's appearance in jail clothes and the prosecutor's comments to Mrs. Tautkus could have made little significant difference.

Williams's right to conduct discovery, including depositions, is protected by Rules 15.1 and 15.3, Ariz.R.Crim.P., 17 A.R.S. When Williams exercised his right to seek exculpatory identification testimony, and to seek it personally rather than through counsel, he took the risk that one of the witnesses would identify him as the suspect. Absent some wrongdoing by the state, we see no reason to prevent it from using inculpatory evidence resulting from Williams's efforts. As every experienced trial lawyer knows, investigation carries with it the risk that some of the evidence obtained may be unfavorable. While Williams had the constitutional right to represent himself and to refuse counsel at any particular stage of the proceeding, that decision created certain risks. The defendant who insists on personally deposing a witness creates a "showup" with its inherent danger of suggestibility. While the Constitution gives the defendant the right to run that risk, it does not protect him from its consequences.

■ Shorn of its due process foundation, Williams's argument thus goes to the credibility of Mrs. Tautkus's testimony, not to its admissibility. *Cf. State v. Myers,* 117 Ariz. 79, 84–85, 570 P.2d 1252, 1257–58 (1977) ("fact that witnesses were previously unable to identify a defendant should properly go to the credibility and not to the admissibility of subsequent positive in-court identifications"), *cert. denied,* 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978). Although it is conceivable that the due process clause prohibits identification testimony that falls below some minimal threshold of reliability when the defendant's right or ability to bring the testimony's weaknesses to the jury's attention is somehow restricted, we decline to apply such a rule in this case. Williams thoroughly cross-examined Mrs. Tautkus. He brought out the inherent weaknesses of her identification as well as the suggestive nature of the deposition. In addition, two very credible, unimpeached eyewitnesses with a better opportunity than Mrs. Tautkus to see the suspect testified that Williams was *not* the man they had seen in

Bunchek's neighborhood. On these facts, we hold that the trial court did not err in admitting Mrs. Tautkus's testimony.

## B. *Rule 11 Competency Motions*

Williams filed motions requesting mental examinations on July 11 and September 19, 1983. *See* Rule 11, Ariz.R.Crim.P., 17 A.R.S. Williams asserted no grounds to support his July 11 request. He merely stated that he was contemplating an insanity defense and wanted to find out whether he was "mentally liable and responsible on March 12, 1981." The September 19 motion was supported by reports of three prior court-ordered psychiatric examinations. These examinations were conducted in 1964 and 1970. All three examinations found some evidence of antisocial behavior and a sociopathic personality. In addition, the doctor conducting one of the 1964 examinations concluded that his findings were consistent with a diagnosis of incipient, but progressing, undifferentiated schizophrenia.

The trial judge denied both motions. He held that there was nothing in the 1964 and 1970 reports to suggest either that Williams was insane when he allegedly killed Mr. Bunchek or that he was incompetent to stand trial. Williams alleges that the trial court erred in denying his motions.

■ Under Rules 11.2 and 11.3, a criminal defendant is entitled to a mental examination by court-appointed psychiatrists if he can establish "that reasonable grounds for an examination exist." Rule 11.3. Evidence is sufficient to establish reasonable grounds for examination if it "creates a doubt in the court's mind," *State v. Borbon*, 146 Ariz. 392, 395, 706 P.2d 718, 721 (1985), as to either defendant's competency to stand trial or his sanity at the time of the alleged offense. Rule 11.2; *State v. Correll*, 148 Ariz. 468, 473, 715 P.2d 721, 726 (1986); *State v. Steelman*, 120 Ariz. 301, 315, 585 P.2d 1213, 1227 (1978).

■ We agree with the trial court's finding that there was insufficient evidence to place either Williams's competency or sanity in doubt. The nature of the crime, Williams's conduct at trial, and prior psychiatric examinations all suggest that Williams was sane at the time of the offense and competent to stand trial. Although Bunchek's death was tragic and vicious, it did not occur under unusual circumstances or in an unusual way; nothing about the killing suggests that the murderer was insane. It is similarly impossible to draw any inference of mental instability from Williams's conduct at trial. Williams insisted on his right to represent himself and in doing so he demonstrated remarkable ability. Finally, Williams's prior psychiatric examinations suggest only that he is prone to engage in antisocial conduct. His subsequent record indicates that this diagnosis was optimistic.

■ In the absence of evidence supporting his motions, Williams's argument is reduced to an assertion that Rule 11 and the due process clause require appointment of a psychiatrist whenever a criminal defendant states that he is "contemplating" an insanity defense. In our view, neither Rule 11 nor the due process clause supports such a principle. Rule 11 and A.R.S. § 13–4013 (requiring trial courts to provide capital defendants with experts "reasonably necessary" to conduct an adequate defense) require at least a minimal showing that defendant may be incompetent or may have been insane. As we read *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the due process clause requires at least this same threshold showing: that the appointment of such an expert is reasonably necessary. No such showing was made on this record. We find no error.

## C. *Sentencing Issues*

### 1. *Pecuniary Gain*

■ The trial court found as an aggravating factor that Williams "committed the murder of John Bunchek in expectation of the receipt of property of pecuniary value." Williams argues that the evidence is insufficient to establish this factor beyond a reasonable doubt.

In capital cases, an aggravating circumstance is established if the state proves

beyond a reasonable doubt that defendant committed the offense for pecuniary gain. A.R.S. § 13–703(F)(5). To prove this aggravating factor, the state " 'must show [that] the actor's *motivation* was the expectation of pecuniary gain,' " so that gain was " 'a cause of the murder, not merely a result.' " *State v. LaGrand* [Walter], 153 Ariz. 21, 35, 734 P.2d 563, 577 (1987) (citations omitted; emphasis in original).

In this case, the jury found beyond a reasonable doubt that Williams burglarized the Tancos house and killed Mr. Bunchek. We believe, therefore, that this case is controlled by our recent decision in *LaGrand.* In that case two brothers stabbed two bank employees while attempting to rob a bank. We concluded that

> the attempted robbery permeated the entire conduct of the defendant.... The reason defendant was [in the bank] was his expectation of pecuniary gain and the reason he stabbed the victim was because the victim was unable to open the safe, frustrating defendant's continuing attempt for pecuniary gain.

153 Ariz. at 36, 734 P.2d at 578. This case compels a similar conclusion. No explanation for the killing exists other than that Bunchek was killed because he discovered a burglary in progress. Unlike *LaGrand,* where the Chief Justice and this writer concluded that the facts permitted other inferences as to the motive for the killing (153 Ariz. at 36 n. 5, 734 P.2d at 578 n. 5), and unlike cases where the facts make no inference more probable than any other, in this case the facts compel us to infer that Bunchek was killed to permit defendant to consummate the burglary or make good his escape. Whether Bunchek was killed before the burglary was started, during its progress, or at its consummation, pecuniary gain was a motivating circumstance. *See State v. Richmond,* 112 Ariz. 228, 232, 540 P.2d 700, 704 (1975) (in dealing with the felony murder rule, "we will not hold a stopwatch on the events or artificially break down the actions of the defendant into separate components in order to avoid

the clear intent of the legislature"). We therefore hold that there is sufficient evidence to support the trial court's conclusion beyond a reasonable doubt that Williams killed Bunchek in expectation of pecuniary gain.[3]

### 2. *Mitigating Evidence*

■ The trial court held that Williams failed to establish any mitigating circumstances warranting a sentence less than death. Williams disputes this conclusion. He argues, among other things, that he is a religious man, that he was subjected to a difficult childhood, that he had been an ideal parolee, that he had been helpful to other inmates while incarcerated, and that the circumstances surrounding his prior convictions warrant mitigation.

Like the trial court, we are unpersuaded by the evidence. Williams's two prior convictions were both for murder. Williams argued to the trial judge that there were mitigating circumstances surrounding both convictions: the key witness against him in the first trial allegedly has recanted, and the second conviction, for felony murder, is based only on his participation in a prison escape, not in the actual killing. Although these factors are not insignificant, they do not rise to the level of mitigation. The fact remains that Williams twice has been convicted of murder. We will not relitigate those convictions. Felony murder may differ from premeditated murder, but it remains an extremely serious crime warranting aggravation, not mitigation. *See* A.R.S. § 13–703(F)(1). Thus, we agree with the trial court's conclusion that the evidence establishes the aggravating factors—pecuniary gain and Williams's two prior murder convictions—beyond a reasonable doubt. *See State v. Richmond,* 136 Ariz. 312, 322, 666 P.2d 57, 67 (1983).

The trial court considered nineteen allegedly mitigating factors. Aside from the evidence regarding his prior convictions, these factors related to Williams's childhood, his strong relationship with his fami-

---

**3.** Williams also argues that A.R.S. § 13–703(F)(5) is unconstitutionally vague. We rejected this argument in *State v. Nash,* 143

Ariz. 392, 400, 694 P.2d 222, 230 (1985), and find no reason to reconsider our analysis.

ly, his good influence on other prisoners, his religious nature, and his help in putting out a prison fire. The trial judge listened to evidence on these points for more than six days. He then concluded that mitigation was not warranted because, despite all these factors, Williams had pursued a life of crime. We agree with the trial court's conclusion. The record clearly demonstrates that Williams has channeled his considerable talents and potential into a life of violent crime for more than twenty years. Williams has two prior convictions for murder. He escaped while incarcerated for the first murder; that escape resulted in a second killing. At the time he killed Bunchek, he was an escapee. Defendant was captured only after a shoot-out with officers. Moreover, he admitted at least one prior armed burglary during which he shot at a surprised resident. We agree with the trial court's finding that the allegedly mitigating circumstances were insufficient to warrant leniency.

### 4. Constitutionality of Arizona's Death Penalty

■ Williams argues that Arizona's death penalty scheme is unconstitutional because it fails to provide adequate standards for balancing aggravating sentencing factors against mitigating sentencing factors, and because it requires imposition of the death penalty if the sentencing judge finds one or more aggravating factors and no mitigating circumstances. We have previously considered and rejected these arguments. *See, e.g., State v. Gillies,* 142 Ariz. 564, 568, 691 P.2d 655, 659 (1984).

Williams argues correctly that the Supreme Court has held state death penalty schemes unconstitutional if they either grant trial judges unlimited discretion or impose a mandatory death sentence for certain types of murder without regard to mitigating circumstances. *See, e.g., Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (plurality opinion); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Consistent with Supreme Court precedent, A.R.S. § 13–703 limits a trial judge's discretion by requiring that mitigating factors

be balanced only against statutorily defined aggravating factors. Section 13–703 also limits the imposition of "mandatory" death penalties by requiring trial judges to consider every conceivable mitigating factor. *See Lockett v. Ohio,* 438 U.S. 586, 601, 98 S.Ct. 2954, 2963, 57 L.Ed.2d 973 (1978). The death penalty is "mandatory" only if the trial judge finds, in his discretion, the existence of one or more statutory aggravating factors and no sufficiently mitigating factors. This procedure attempts to balance fairly the competing needs to consider each defendant's individual circumstances and yet to treat like cases in a roughly similar manner. The trial judge is not foreclosed from considering *any* factor, including his belief that defendant's character and/or the possibility of defendant's future value to society warrant mitigation of the sentence.

We cannot say that A.R.S. § 13–703 strikes this balance in an unconstitutional fashion. The defendant's ability to raise any and all relevant factors in mitigation provides the required discretion; the statutory procedure provides the required guidance.

*Gillies,* 142 Ariz. at 568, 691 P.2d at 659; *accord Adamson v. Ricketts,* 758 F.2d 441, 451–52 (9th Cir.1985). *See generally* Poulos, *The Supreme Court, Capital Punishment and the Substantive Criminal Law: The Rise and Fall of Mandatory Capital Punishment,* 28 ARIZ.L.REV. 143 (1986).

Williams asserts that the Arizona death penalty scheme is unconstitutional for five additional reasons: (1) the death penalty is a cruel and unusual punishment; (2) the death penalty denies defendant the right to a jury trial on the punishment phase of the proceedings; (3) the death penalty allows the prosecutor to arbitrarily decide when to seek death; (4) the death penalty places the burden on the defendant to prove mitigating circumstances; and (5) the death penalty is imposed arbitrarily, capriciously, and freakishly. We recently have rejected each of these arguments. *E.g., State v. Wallace,* 151 Ariz. 362, 366, 728 P.2d 232, 236 (1986); *Correll, supra; State v. Bracy,* 145 Ariz. 520, 703 P.2d 464 (1985), *cert. denied,*

474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986). We see no reason to reconsider our prior analyses.

■ Williams also argues that the manner in which execution is carried out, by lethal gas, constitutes cruel and unusual punishment in violation of the eighth and fourteenth amendments to the United States Constitution and art. 2, § 15 of the Arizona Constitution. We cannot accept Williams's argument under the state constitution because art. 22, § 22 specifically requires that the death penalty "be inflicted by administering lethal gas." *See also Hernandez v. State,* 43 Ariz. 424, 441, 32 P.2d 18, 25 (1934). Williams's argument also has been rejected uniformly on the federal level. *E.g., Gray v. Lucas,* 710 F.2d 1048 (5th Cir.), *cert. denied,* 463 U.S. 1237, 104 S.Ct. 211, 77 L.Ed.2d 1453 (1983). Finally, Williams argues that his constitutional rights were violated because he was not allowed to voir dire the trial judge. We rejected this argument in *State v. Rossi,* 741 P.2d 1223, 1225–26 (Ariz.S.Ct.1987).

### F. *Form of Verdict*

■ Williams asserts that he was charged by indictment with first degree murder based on two alternative theories—premeditated murder and felony murder. Williams then argues that he was denied his constitutional right to have premeditation found by a unanimous verdict because the judge only instructed the jury on a felony murder theory.

Williams's argument is misplaced. Contrary to his assertion, Williams was not charged under a premeditation theory. The indictment charges Williams with first degree murder based solely upon a felony murder theory. Consequently, the judge's instructions were proper; Williams was not entitled to an instruction or jury finding regarding premeditation. *See State v. Encinas,* 132 Ariz. 493, 496, 647 P.2d 624, 627 (1982). We hold that Williams's right to a unanimous verdict was satisfied in this case.

### G. *Prosecutorial Misconduct*

■ Williams's final argument is that the prosecutor withheld information relating to the whereabouts of James McClaskey in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Williams alleges that McClaskey was a material witness because his defense was that McClaskey and his friend Bobby had robbed and killed Mr. Bunchek. Williams further alleges that the prosecutor's office knew where McClaskey was and failed to provide that information to him.

In our view, the record does not support the contention that the state failed to disclose McClaskey's whereabouts. The state located McClaskey in Sonora, Texas and had a telephone number for one of his Texas neighbors. This information was provided to defense investigators sometime before April 1983. Defense investigators reached McClaskey's neighbor but apparently were never able to reach McClaskey.

The state was in contact with McClaskey regarding the April and May 1983 trial dates. McClaskey had informed state investigators that he was anticipating moving to California to have surgery. He had promised, however, to wait until after the trial. Sometime in May 1983, McClaskey apparently left Texas for California and was never located again by either the state or Williams. The state did not immediately disclose to the defense its knowledge that McClaskey had left Texas. Prior to trial, however, Williams had as much information regarding McClaskey's whereabouts in Texas as did the state. On this record, we hold that the state did not fail to disclose relevant information to the defense.

### H. *Proportionality Review*

■ We review all death sentences to determine whether they are excessive or disproportionate in light of the crime committed and the penalties imposed in similar cases. *E.g., Correll,* 148 Ariz. at 484, 715 P.2d at 737; *Bracy,* 145 Ariz. at 538, 703 P.2d at 482. "The death penalty is reserved for those cases where the manner in which the crime was committed raises it

above the norm of first degree murders, *or* the background of the defendant places [him] above the norm of first degree murderers." *State v. Blazak,* 131 Ariz. 598, 604, 643 P.2d 694, 700 (emphasis added), *cert. denied,* 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982).

In this case, we are unable to conclude that the death penalty is justified by the manner in which Bunchek was killed. Although Bunchek's death was senseless and tragic, the evidence does not establish that he was killed in a cruel or depraved manner. *Cf. State v. Moorman,* 154 Ariz. 578, 744 P.2d 679 (1987); *Correll, supra.* We find, however, that the death penalty is justified by Williams's prior convictions for serious "crimes involving violence." *See Correll,* 148 Ariz. at 485, 715 P.2d at 739; *accord Blazak,* 131 Ariz. at 604, 643 P.2d at 700. Williams has two prior convictions for murder. He killed Bunchek after escaping from prison. In addition, Williams conceded at trial that he had committed at least one other armed burglary during which he had shot at a resident who returned home during the burglary. Involvement in two prior killings clearly shows that Williams is "above the norm" of even first degree murderers. The death penalty is neither excessive nor disproportionate under these facts.

### III. CONCLUSION

We have reviewed the record for fundamental error pursuant to A.R.S. § 13-4035 and have found none. We affirm each of the trial court's findings. Williams's convictions and sentences are affirmed.

GORDON, C.J., and CAMERON, HOLOHAN and FROEB, JJ., concur.

Justice JAMES MOELLER did not participate in the determination of this matter; pursuant to Ariz. Const. art. 6, § 3, Judge DONALD F. FROEB of the Court of Appeals, Division One, was designated to sit in his stead.