NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

DANTREIL AMON GRIFFIN, *Appellant.*

Nos. 1 CA-CR 22-0380
1 CA-CR 23-0083
(Consolidated)
FILED 2-13-2024

Appeal from the Superior Court in Maricopa County
No. CR2019-105162-001
The Honorable Ronee Korbin Steiner, Judge
The Honorable Timothy J. Ryan, Judge

**VACATED IN PART; AFFIRMED IN PART**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joshua C. Smith
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Jennifer Roach
*Counsel for Appellant*

**MEMORANDUM DECISION**

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Kent E. Cattani and Judge Anni Hill Foster joined.

**C A M P B E L L**, Judge:

¶1        Dantreil Griffin appeals his convictions and sentences for first-degree murder, aggravated assault, unlawful discharge of a firearm, and assistance of a criminal street gang. He argues that 1) the trial court erred by failing to preclude unreliable witness identification, 2) the trial court coerced a deadlocked jury into rendering a verdict, 3) the prosecutor failed to give notice of the possible sentencing range, and 4) the victim's-rights penalty imposed was an ex post facto violation. In briefing, the parties agreed that the nine-dollar victims' rights penalty imposed was an ex post facto violation. We therefore vacate the victims' rights penalty assessment. As for the remaining issues, we affirm for the reasons below.

**BACKGROUND**

¶2        Griffin was affiliated with the criminal street gang known as the 2200 Block Bloods. The murder victim, William Smith,[1] was a documented member of the Park South Crips—the Bloods' rival gang. In November 2018, Smith robbed Griffin's acquaintance, Tyler, at a nightclub. Smith was robbed at the same nightclub the following month.

¶3        A few weeks after being robbed, Smith was driving with his girlfriend when they were shot at and chased by a male in a white Camaro. This Camaro was later identified in music videos featuring Griffin, Tyler, and Tyler's half-brother, Cole. Law enforcement later determined that the white Camaro belonged to Cole.

¶4        On December 29, 2018, Smith was shot and killed at a gas station in Tempe. Immediately after the shots were fired, a white Camaro matching the description of Cole's vehicle fled the scene. Smith's girlfriend, Ashley, was present when he was shot. Two bystanders also witnessed the

---

[1]        We use pseudonyms to protect the identities of the victims and witnesses.

shooting. Two of the three eyewitnesses—Ashley and Karen—later selected Griffin out of a photo lineup, but neither did so immediately.

¶5 During an interview, police asked Ashley to look at the mutual Facebook friends she shared with Cole. One of the mutual friends was Griffin, whose Facebook name was "Fly B Fresco." A detective asked Ashley if she knew Fly Fresco, to which she replied she did not. Three days later, Ashley told detectives that after searching on social media, she believed Fly Fresco (Griffin) shot her boyfriend. She identified Griffin in a photo lineup later that month.

¶6 Karen, an independent eyewitness, was shown a photo lineup in early January. She did not pick anyone from that lineup. The next day, she called police and said she wanted to view the lineup again. At that time, she chose Griffin out of the original lineup.

¶7 Before trial, Griffin moved to preclude the pretrial identification evidence, arguing that Ashley's identification was the result of an unduly suggestive police procedure, and Karen's identification was unreliable. The court found both identifications to be properly obtained and sufficiently reliable to be admissible at trial.

¶8 On the 18th day of trial, the court received a note from the jury that read: "After rigorous deliberation last evening, we voted unanimously. We came this morning to render a verdict. One juror changed their vote this morning and indicated that their mind is made up. What now?" Without objection from either party, the judge delivered an impasse instruction. The jury requested a lunch break and a chance to continue deliberating. Three hours later, the jury rendered guilty verdicts on all charges.

¶9 After Griffin was convicted of the crimes detailed above, the court imposed the following sentences: natural life for first-degree murder; life with the possibility of release after 30 years for aggravated assault; 6.75 years for unlawful firearm discharge; and 16.25 years for assisting in a criminal street gang. Counts 2-3 were aggravated by the gang affiliation enhancement. Griffin timely appealed.

## DISCUSSION

### I.    Admission of Pretrial Lineup Identification

¶10 Griffin argues that Ashley's pretrial identification was the result of unduly suggestive police conduct and should have been

precluded. He asserts that by directing Ashley's attention to Griffin's Facebook page, the detective suggested suspicion of Griffin, leading Ashley to conduct her own investigation. Griffin alleges that the detective's conduct improperly resulted in Ashley later identifying him as the shooter. We disagree.

¶11          We review trial court rulings on pretrial identifications for abuse of discretion. *State v. Moore*, 222 Ariz. 1, 7, ¶ 17 (2009). "The ultimate question of the constitutionality of a pretrial identification is, however, a mixed question of law and fact" to be reviewed de novo. *Id.* (citing *Sumner v. Mata*, 455 U.S. 591, 597 n.10 (1982)). To show that the admission of pretrial identification testimony violated the defendant's due process rights, the defendant must establish that "(1) that the circumstances surrounding the pretrial identification 'created a substantial likelihood of irreparable misidentification,' and (2) the state bore sufficient responsibility for the suggestive pretrial identification." *State v. Williams*, 166 Ariz. 132, 137 (1987) (citing *Simmons v. U.S.*, 390 U.S. 377, 384 (1968)). If the court finds the pretrial identification procedure to be unduly suggestive, the defendant must then show that the identification itself was unreliable under the totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188, 199 (1972).

¶12          Here, Ashley's investigation into the social media profile of Griffin—leading to her identification of him as the shooter—was not attributable to the detectives. Initially, Ashley was shown a list of 12 Facebook profiles with a reduced, thumbnail-sized profile photo next to each profile with their associated profile names. When a detective later pointed out Griffin's social media account, he did not do so in a way that suggested Griffin was the shooter. Rather, he asked: "This Fly Fresco, how do you know him?" When Ashley replied that she did not, he remarked that they had mutual friends. She explained that she often added Facebook friends with mutual friends without knowing them personally, and the discussion of Fly Fresco ended. Ashley was not asked by the detectives to look at Griffin's profile, enlarge his profile photo, or engage in any kind of investigation. To the extent she did any of these things, she did them on her own. And when she was later shown a photo lineup, the lineup included Griffin, who she identified as the shooter. The court did not err by admitting evidence that Ashley identified Griffin as the shooter.

¶13          Griffin argues that the second identification was also suggestive, but he does not fully develop that argument. We find no error in the admission of evidence that Karen identified Griffin from a photo lineup. Although she did not initially identify Griffin when she was first shown a photo lineup, she requested that she be permitted to see the same

lineup soon thereafter. At that point she identified Griffin as the shooter. Our supreme court has held that showing a witness multiple lineups in which the only common person in each grouping is the prime suspect, while potentially suggestive, is not necessarily fatal. *State v. Alvarez*, 145 Ariz. 370, 372 (1985). Here, Karen was not shown different lineups with only Griffin as a common suspect. Rather, she simply revisited the lineup once she felt ready to make an identification. Because Griffin was not singled out in the second lineup, the procedure in which Karen identified him was not suggestive, and especially not unduly suggestive.

**¶14** "The law does not preclude a victim from identifying his attacker, presented alone, at a later time just because the victim could not identify the attacker in a group earlier." *State v. Myers*, 117 Ariz. 79, 84 (1977). Karen and Ashley both were shown a group of photos, each including a photo of Griffin. The record does not indicate that either Karen or Ashley was influenced at all, let alone unduly influenced by the State, after failing to initially identify the shooter. *Cf. Simmons*, 390 U.S. at 385 (noting "[t]here is no evidence to indicate that the witnesses were told anything about the progress of the investigation, or that the [government] agents in any other way suggested which persons in the pictures were under suspicion"). Instead, both witnesses, on their own volition, asked for a second chance to view the lineups they were originally shown. Needing additional time to accurately identify a suspect does not render the identification procedure unduly suggestive. Because neither identification was the result of suggestive lineup procedures, we find no need to review the totality of the circumstances for reliability. *See Biggers*, 409 U.S. at 199. And because we find no error in the court's introduction of Karen's identification, even if we were to find Ashley's identification to be the result of suggestive conduct, such an issue would constitute harmless error. *See United States v. Carr*, 761 F.3d 1068, 1074 (9th Cir. 2014) ("[E]ven if the pretrial identification procedure was suggestive and the identification was unreliable, this court must examine the district court's failure to exclude the identification for harmless error."); *State v. Williams*, 133 Ariz. 220, 226 (1982) (erroneous admission of cumulative evidence is harmless error). We affirm the admission of both lineup identifications accordingly.

## II.    Use of the Impasse Jury Instruction

**¶15** Second, Griffin argues that the court improperly coerced a deadlocked jury into rendering a verdict, violating his right to a fair trial. He emphasizes that the jury was split 11-1 and that the court knew of the numerical split. Because the jury was still deliberating, and because the

court properly assisted the jury by giving an impasse instruction, we find no error.

**¶16**     Griffin did not object to the court giving the impasse instruction, so we review this issue for fundamental prejudicial error. *See State v. Escalante*, 245 Ariz. 135, 140, ¶ 12 (2018). Jury coercion exists when the trial judge encourages a deadlocked jury to reach a verdict. *State v. Davolt*, 207 Ariz. 191, 213, ¶ 94 (2004). If the numerical division of a split jury is known, and particularly if the split is lopsided, encouraging the jury to render a decision can amount to coercion. *State v. McCutcheon*, 150 Ariz. 317, 320 (1986). However, giving an impasse instruction to a jury where the numerical split is known is not per se coercive. *State v. Huerstel*, 206 Ariz. 93, 100, ¶ 19 (2003); *see also State v. Sabala*, 189 Ariz. 416, 418–19 (App. 1997). Rather, when the jury affirmatively asks the court for help after reaching an impasse, Arizona Rule of Criminal Procedure (Rule) 22.4 specifically authorizes the court to assist.

**¶17**     In *State v. Sabala*, a split jury revealed that it reached an impasse, noting its numerical split and how the majority voted. 189 Ariz. at 417. Over objection, the court issued an impasse instruction offering ideas for resolution, but urging the jurors that the instruction was not intended to force a verdict. *Id.* at 417–18. The jury resumed deliberating for almost two hours, then reached a verdict. *Id.* at 418. The defendant argued these circumstances coerced the sole "not guilty" juror into changing his vote. *See id.* We disagreed, noting several factors weighing against coercion: that the jury never expressed further deliberations would be futile, the length of time spent deliberating after the instruction, and that the instruction explicitly counseled against forcing a verdict. *Id.* at 420.

**¶18**     The circumstances of the impasse instruction in the present case similarly do not show coercion. Like in *Sabala*, when the jury sought help from the judge, the foreman did not indicate that reaching a verdict was hopeless. Rather, the foreman explained the split and asked how to proceed. Moreover, as in *Sabala*, the court warned the jurors to retain their independent judgment and not to force a verdict: "This [impasse instruction] is offered to help you, not to force you to reach a verdict . . . you should not change your belief concerning the weight or effect of the evidence . . . for the mere purpose of returning a verdict." Moreover, unlike in *Sabala*, here, Griffin did not object to the proffered impasse instruction. He has not established fundamental error resulting from the superior court's decision to give an instruction authorized by Rule 22.4.

### III. Use of A.R.S. § 13–706(A) Sentencing Enhancement

**¶19**          Finally, Griffin argues that he did not receive constitutionally adequate notice of the range of sentence for the aggravated assault charge. The State filed an allegation seeking to enhance any potential sentence under A.R.S. § 13–706(B), yet Griffin was sentenced pursuant to A.R.S. § 13–706(A). Between the filing of the allegation and sentencing, the State twice noted that Griffin could face 25 years to life if convicted of aggravated assault. Griffin did not seek clarification or express confusion either time. After trial, Griffin objected to an enhanced sentence under the statute alleged (–706(B)) *and* the subsection not formally alleged (–706(A)). Though the State conceded its filing error in its reply to Griffin's objection, the record shows that Griffin had actual notice that he faced a sentencing enhancement based on his prior felony convictions (-706(A)).

**¶20**          "Sentencing determinations are reviewed for abuse of discretion." *Davolt*, 207 Ariz. at 216, ¶ 112. For sentence enhancement allegations, notice must be such that the defendant is not "misled, surprised or deceived in any way by the allegations of prior convictions." *State v. Benak*, 199 Ariz. 333, 337, ¶ 16 (App. 2001) (citation and internal quotation marks omitted). "[T]he touchstone of the Sixth Amendment notice requirement is whether the defendant had actual notice of the charge, from either the indictment or other sources." *State v. Freeney*, 223 Ariz. 110, 115, ¶ 29 (2009).

**¶21**          Griffin argues that because -706(A) offenses are elementally distinct from -706(B) offenses, he was deprived of a complete defense to a life sentence for the assault charge. While his criminal history would not have permitted him to be sentenced under the prior violent felony conviction enhancement (-706(B)), Griffin had actual notice of and objected to the sentence he faced under -706(A). As the record reveals, when he objected to the enhancement for prior violent felony convictions, he also objected to being sentenced under the non-violent felony enhancement. Moreover, the State set out the sentencing range he would be facing at a settlement conference, and the range of sentence was consistent with a sentence imposed under -706(A). Griffin did not raise any objection or seek clarification of the range of sentence discussed at the settlement conference. Griffin's actual knowledge of the State's intentions are further cemented in the final trial management statement. In that statement, the range of sentence "25 years to life" was set forth and acknowledged by both the State and Griffin. Griffin's direct acknowledgment of the sentence he received completely dispels his claim that he was unaware of the possible range of sentence he could be facing should he be convicted. The trial court

committed no abuse of discretion in relying on these facts to uphold his sentence. Accordingly, we affirm.

## CONCLUSION

¶22     Per both parties' request, we vacate the victim's rights penalty assessment of nine dollars. We affirm Griffin's convictions and sentences for lack of error or abuse of discretion.

